IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|   |   |   |
|---|---|---|
| MICHAEL WAYNE NORRIS, | § § § | |
| Petitioner, | § § | |
| v. | § | H-12-CV-3645 |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal | § | |
| Justice-Correctional Institutions Division, | § § | |
| Respondent. | § § | |

**Memorandum and Order**

Petitioner Michael Wayne Norris is a Texas death row inmate. This case is before the

Court on Norris' Petition for Writ of Habeas Corpus and Respondent William Stephens' Motion

for Summary Judgment. Having carefully considered the Petition, the Summary Judgment

Motion, the evidence, and the arguments and authorities submitted by counsel, the Court is of the

opinion that Respondent's Motion for Summary Judgment should be GRANTED IN PART, and

Norris' Petition for Writ of Habeas Corpus should be GRANTED IN PART.

**I.        Background**

The Texas Court of Criminal Appeals ("TCCA") summarized the evidence:

Georgia Rollins and [Norris] were romantically involved. [Norris] sometimes
babysat Georgia's two-year old son (the baby). On the evening of the offense,
Georgia would not allow [Norris] to babysit the baby while Georgia attended
church, as they previously had agreed. Georgia took the baby to church with her.
[Norris] appeared at the church during the services to get the baby, and had some
type of confrontation with Georgia during which a security guard had to
intervene. [Norris] became angry, went home without the baby, and took a nap.
[Norris] lived a short distance from the mother's apartment.

[Norris] claimed he attempted to contact Georgia by telephone later that night but she would hang up the phone each time he called. [Norris] took a high-powered deer rifle to Georgia's apartment, which she shared with other members of her family who were home at the time, and shot the baby and Georgia (the mother) at close range inside the mother's bedroom. The baby was killed instantly, and the mother died later that night at a local hospital.

The mother's family members, none of whom were in a position to see the entirety of the events occurring inside the mother's bedroom, provided testimony that [Norris] appeared outside the mother's bedroom window, broke the glass and fired a shot into her bedroom. The mother was talking to someone on the telephone when [Norris] broke the glass in her bedroom window. [Norris] climbed into the bedroom and said to the mother, "I hate to do this Georgia, but I told you. I told you you couldn't mess me over. I told you you couldn't leave me." He then fired several shots in the mother's direction. He left the room, turned the doorknob on another bedroom door in the apartment, and returned to the mother's bedroom. He then told the mother he hated to see her suffer and fired a couple of more shots in her direction. The mother's family members testified they heard about five shots but they could not be sure. The mother's sons saw [Norris] leave the mother's bedroom with the rifle. [Norris] said to them, "Y'all get out of my way. Let me go out. I done come and do what I come to do. Just let me go out."

[Norris] returned home, where he lived with his mother, told her he had killed the mother and the baby, and he was sorry. [Norris]'s mother testified [Norris] was sobbing. [Norris] also called his pastor and the police to turn himself in. The police arrested [Norris] shortly thereafter at his home without incident and seized the rifle. Later that night, [Norris] confessed to the police he had killed the mother and the baby, and he was sorry.

The police quickly arrived at the mother's apartment and secured the scene. Officer Gafford testified he found three spent rifle casings inside the mother's bedroom and one outside her bedroom window. Another spent casing was found in [Norris]'s rifle. Gafford testified he observed five total wounds on the baby. Several crime-scene photographs, showing multiple wounds on the baby, were admitted into evidence.

The State presented other evidence showing the baby suffered four initial entry wounds: two to the head, one to the chest, and one to the right leg or thigh, which was nonfatal. The gunshot wounds to the head and chest were fatal. The mother suffered three "irregular gunshot wounds" to the head and chest and fragment wounds to her face, neck, chest, and left arm going into the chest. The gunshot wound to the chest and the gunshot wound to the left arm going into the chest were fatal. Most of the wounds the mother suffered were from fragments of

bullets that first hit the baby.

The State's evidence also showed that when [Norris] fired the first shot from outside the mother's bedroom the mother was sitting or kneeling on the floor next to her bed, and the child was lying on the bed. The first shot hit the baby in the right leg or thigh, and the mother picked up the nonmortally wounded baby and held him to her breast crying, "my baby, my baby." [Norris] climbed into the mother's bedroom and fired another shot. This shot entered the baby's forehead and fragmented; the fragments came out of the back of the baby's head in three places and hit the mother in the face and neck, fracturing her jaw and exiting through her tongue. The medical examiner testified the mother's wounds from this shot were nonfatal. Thereafter, [Norris] shot the baby and the mother several more times

[Norris] testified at the guilt-innocence stage that he did not intend to use the rifle when he went to the mother's apartment, and that he took the rifle with him for protection from the mother's sons in case there was any trouble. He testified he wanted to talk to the mother about why she was treating him badly, but she refused to answer the door.   [Norris] testified he was emotionally distraught because the mother embarrassed him at the church, hung up the phone when [Norris] tried to call her and refused to talk to him when he came to her apartment. [Norris] also testified he was depressed because of the problems in their relationship.

[Norris] testified he intended to kill only the mother when he shot the baby. [Norris] also testified that when he fired the first shot from outside the mother's bedroom window the mother was kneeling by the side of the bed holding the baby against her left breast. He said he aimed away from the baby, and fired in the direction of the mother's right breast but the shot went through the baby's head, and also hit the mother in the face or the neck.

> Q. So that first shot would have hit the baby in—what?—the right side of the head?
>
> A. Right side of the head and come out the front and blow the back open.
>
> Q. Blow the back of the baby's head off.
>
> A. Open, not off. Open.
>
> Q. And [the mother] is hit also; isn't that correct?

3

A. Right. I think I probably hit her in the face or the neck when it went through [the baby].

Q. Face or neck?

A. Face or neck or somewhere like that."

According to [Norris], this was when the mother began crying, "my baby, my baby."

Q. Tell the jury whether or not [the mother] moved the baby before the bullet struck, if you know."

A. To be honest with you, it happened so quick, I can't tell how she moved; but some kind of way, the first shot went through the baby's head and hit her, too, because after the first shot, the [mother's sons] ran out of the room.

Q. What did you do next? Tell the jury what you did next.

"A. I stepped into the bedroom and walked up and looked at them.

Q. How did the baby appear to you?

A. He was in real bad shape. The bullet had went in and, you know, blowed the side of his head open.

Q. How did you feel when you saw that you had hit the baby that you had been taking care of?

A. I didn't feel real bad (sic).

Q. What did you do next?

A. She was moaning, saying, 'My baby, my baby,' you know, and crying."

[Norris] testified he then climbed into the mother's bedroom and shot her two or three times. [Norris] claimed he shot the baby only once.

4

> Q. So how many times did you shoot [the mother] and the baby?

> A. I shot—the baby got shot one time. The first shot went through his head and hit [the mother]."

He testified someone, possibly the police, shot the dead baby several more times to make it look like [Norris] intentionally killed the baby.

> Q. It's cruel and unusual punishment; so you just decided to start blasting away a woman with her baby?

> A. The baby was killed instantly. The baby was already dead. I didn't attempt to move it at all. I just stood there and shooting two or three more times. And by me having another shot, all of this is coming to her left side. And that's how her arm—they say her arm was shot or something. That's probably how it was shot. From there—all them other shots they claim was in the baby—I don't know how they get in there. But when they left I only saw that one wound to the head from that first shot, if it did that. How all these other holes get on him I don't know.

> * * * * * *

> Q. Isn't it amazing how two bullets get right into that baby's body, without anybody trying to—

> A. Amazing. I can't figure it out. That's why I wanted to take the stand and tell my part. And it be up to the jury to believe what they want to believe.

> * * * * * *

> Q. Let's take a look at State's Exhibit 36. Here's [the baby's] right leg, shot from behind; blew his leg right open. How do you suppose that happened?

> A. Can't figure it out, because I never was behind him like that. I was always to, like I say, the side, behind the—behind; so how this stuff—I don't know. If somebody tampered with the baby after it was already dead to make things look like I definitely intended to do it, then it's a possibility. It could have happened. I'm sure the

5

> State of Texas is going to try all they can to try to get me the death penalty. However you going to do it, you'll do it. I don't know how you going to rig that up.
>
> Q. Did the police shoot the baby after it was dead? Is that what you're saying?
>
> A. Something like that. I don't know how it was done like that.
>
> * * * * * *
>
> Q. Your view is all this happened just with one bullet?
>
> A. My view is one bullet did that damage to its head. And after I looked at him, wasn't nothing wrong with—with his chest or his legs, as far as a I saw. I myself—I'm the one that was there. After I left—all this other damage happened to him—I don't know how it happened.

The State cross-examined [Norris] on the two prior statements he made to his mother and to the police just after the killings in which he admitted killing the mother and baby, but never claimed he accidentally killed the baby. [Norris] testified he told the police he accidentally killed the baby but they did not put that in his confession. The prosecutor noted the police put other mitigating matters in [Norris]'s statement such as his being sorry for the killings. [Norris] also testified he previously pulled a pistol on the mother and threatened to kill her and himself if she ever left him.

*Norris v. State*, 902 S.W.2d 428, 430-34 (Tex. Crim. App. 1995) (footnotes omitted).

The TCCA affirmed Norris' conviction and sentence. *Id.* Norris filed two applications for habeas corpus relief. The TCCA denied his first application for habeas corpus relief on December 2, 2012. *Ex Parte Norris*, 390 S.W.3d 338 (Tex.Crim.App. 2012). The TCCA dismissed the second application as successive, *Ex Parte Norris*, No. WR-72,835-01 (Tex.Crim.App. Nov. 4, 2009).[1]

---

[1]    It appears that Norris filed his first application in June 1997. *See* SH at 43. The trial court did not enter findings of fact and conclusions of law until August 2012. *Id.* at 419. Norris'

6

Norris filed a skeletal petition for a writ of habeas corpus in federal court on December 14, 2012.  He supplemented the skeletal petition on July 6 and 7, 2013.  The respondent moved for summary judgment, and Norris responded.

## II.  The Applicable Legal Standards

### A.    The Antiterrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective April 24, 1996.  *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).  Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).  For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."  *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001).  Under the "contrary to" clause, this court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme

---

second application was received by the TCCA on October 5, 2009.  It raised a single issue, arguing that a 2008 TCCA decision overruled the TCCA's decision in Norris' direct appeal.  The record is confusing, however, in that the TCCA entered a judgment dismissing Norris' second application as successive, *id.*, yet, its published 2012 opinion appears to address the issue raised in the second application.  *Ex Parte Norris*, 390 S.W.3d 338 (Tex.Crim.App. 2012).  These procedural peculiarities, however, do not affect the disposition of Norris' federal petition.

Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104 (2003). The sole inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

8

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).  The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998).

### B.    The Standard For Summary Judgment In Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000).  In ordinary civil cases a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Where, however, a state prisoner's factual allegations have been resolved against him by express or implicit findings of the state courts, and the petitioner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor.  *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981).  In reviewing factual determinations of the Texas state courts, this court is bound by such findings unless the petitioner shows that an exception to 28 U.S.C. § 2254 applies.

9

III.    **Analysis**

Norris' petition and supplement raises 15 claims for relief.  These are addressed in turn.

A.    **Sufficiency of the Evidence**

Norris was convicted under the theory that he murdered more than one person during the same criminal transaction. In what are labeled as his first four claims, Norris contends that: (1) the evidence was insufficient to sustain his conviction for capital murder; (2) The State's use of the doctrine of transferred intent deprived him of due process; (3) the evidence was insufficient to demonstrate that he is a future danger; and (4) the evidence was insufficient to support the jury's finding that he acted deliberately.

1.    Penalty Phase Issues

Norris offers no argument on points 3 and 4, raising them only in point headings. Therefore, with regard to claims 3 and 4, Norris fails to demonstrate any violation of his constitutional rights.  *See Beazley v. Johnson*, 242 F.3d 248, 270 (5th Cir. 2001).

2.    Sufficiency of the Evidence

In addressing a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  The sufficiency of evidence is a mixed question of law and fact.  *See Gomez v. Acevedo*, 106 F.3d 192, 198 (7th Cir. 1997), *vacated on other grds.*, 522 U.S. 801 (1997).  Therefore, as noted above, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."

*Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).

On Norris' direct appeal, the TCCA observed that the

jury was instructed that appellant could be convicted of capital murder if it found appellant intentionally caused the death of the baby by shooting him with a firearm and intentionally caused the death of the mother by shooting her with a firearm, and the deaths of both occurred during the same criminal transaction. The jury also was instructed, pursuant to V.T.C.A., Penal Code, Section 6.04(b)(2), that it could find appellant guilty of capital murder if it found appellant intentionally caused the death of the mother by shooting her with a firearm and during the same criminal transaction either intentionally caused the death of the baby by shooting him with a firearm, *or intended to cause the death of the mother by shooting her with a firearm, and caused the death of the baby by shooting him with a firearm and the only difference between what actually occurred and what he desired, contemplated, or risked is that a different person or property was injured.*

*Norris*, 902 S.W.2d at 436. In affirming the conviction, the TCCA found that "the evidence, when viewed in the light most favorable to the verdict, is sufficient to prove appellant specifically intended to kill the baby." *Id.* The Court further held that the murder of the baby could be attributed to Norris under the capital murder statute under a theory of transferred intent, *i.e.*, that Norris' intent to murder Georgia transferred to the baby when he, according to his version of events, accidentally killed the baby. The Court rejected Norris' argument that it was improper to transfer his intent to kill Georgia to the baby, and also retain the intent to hold him liable for Georgia's murder, *i.e.*, that transferred intent should not be used to elevate "simple" murder to capital murder when the evidence showed only a single intent and he also killed the intended victim. *Id.* at 437-38.

In a concurring opinion, Judge Clinton opined that the evidence also supported a finding that Norris formulated two separate intents: First, he intended to kill Georgia but inadvertently killed the baby, making him liable under a theory of transferred intent; second, he realized that

he killed the baby but not Georgia and committed a second, distinct, act to kill Georgia.  Judge Clinton thus observed that the State did not rely on a single intent, but two separate intents, to convict Norris of multiple murder.  *Id.* at 449.

Judge Baird, in a separate concurrence, concluded that the majority's discussion was unnecessary because the evidence did not support Norris' theory of a single intent.  Rather,

> [w]hen [Norris] realized he had killed the infant but not the mother, [Norris] continued to shoot and eventually killed the mother. Thus, the murders were *not* committed in "a single act." Consequently, appellant was criminally responsible for both murders and the doctrine of transferred intent was not impermissibly expanded.

*Id.* at 452.  Judge Baird concluded that "[b]ecause the majority's discussion of that issue is not essential to the resolution of the instant case it is merely *obiter dictum."  Id.*

Thirteen years later, the TCCA reversed the majority decision in *Norris*, to the extent that *Norris* could be understood to allow transferred intent to support a multiple murder theory of capital murder when the evidence showed only a single intent.  *Roberts v. State*, 273 S.W.3d 322, 330-31 (Tex.Crim.App. 2008).  In *Roberts*, the defendant was convicted of capital murder for murdering a pregnant woman.  The State argued that the defendant was also liable for the death of the fetus under a theory of transferred intent.  *Id.* at 325.

In his second state habeas application, Norris argued that *Roberts* overruled the decision on Norris' direct appeal and established that the evidence was insufficient to sustain his conviction for capital murder.  Norris' argument, once again, was that he only intended to kill Georgia, and that his specific intent could not both be transferred to the baby and retained with regard to the death of Georgia.  In rejecting Norris' claim, the TCCA stated:

> In overruling *Norris* to the extent that it allowed a single intent to support the requirement of two intentional or knowing deaths, we did not invalidate the

12

> concurring opinions' separate rationale for upholding applicant's conviction—that applicant engaged in two discrete instances of conduct that carried separate intents. Our statement in *Roberts* that there must be "proof of intent to kill the same number of persons who actually died" was *dictum,* and we now decide that such *dictum* was improvident. It is certainly possible to intend more than once to kill a particular person.

*Ex Parte Norris*, 390 S.W.3d 338, 341 (Tex.Crim.App. 2012).  The Court concluded

> [Norris'] instances of conduct occurred very close in time but were still sufficiently separate to involve separate intents. First, he fatally shot the child in the head, either (1) intending to kill the child or (2) intending to kill the mother but killing the child instead. Even if the latter were the case, his intent transferred to the child. Then, realizing that he had killed the child, he continued to shoot at the mother, thus engaging in conduct with a separate intent to kill.

*Id.*

The evidence clearly supports this conclusion.  The record shows that Norris shot at Georgia through her bedroom window, hitting the baby.  21 Tr. at 28-29, 150; 22 Tr. at 368, 541-49.[2]  The first shot to hit the baby was not fatal.  22 Tr. at 368.  Norris then climbed through the window into the room and fired additional shots; several of these were fatal to the baby.  The evidence further shows that Norris then left the room momentarily, and returned to fire the shots that killed Georgia.  21 Tr. at 35-41, 86-87; 22 Tr. at 369, 550-51.  Even accepting Norris' claim that he never intended to kill the baby, this evidence unquestionably supports a finding that he intended to kill Georgia but killed the baby inadvertently, making him liable under transferred intent, then committed a second discrete act under a newly formed intent to kill Georgia, resulting in Georgia's death.

Viewing this evidence in the light most favorable to the prosecution, there is no doubt that a rational juror could have found Norris guilty of capital murder.  *Jackson*, 443 U.S. at 319.

---

[2] "Tr." refers to the transcript of Norris' trial.

Moreover, the TCCA's conclusion that the evidence was sufficient is clearly reasonable, and is thus entitled to deference under the AEDPA.  Therefore, Norris is not entitled to relief on this claim.

### 3.     Due Process

Norris also claims that his right to due process was violated by an incorrect jury instruction.  As the analysis above demonstrates, the instruction accurately reflects Texas law on transferred intent as applicable to the capital murder statute.  Therefore, the jury was not incorrectly instructed, and Norris fails to demonstrate any denial of due process based on the jury instruction.

## B.     **Evidence of Prior Conviction**

The State introduced evidence of Norris' prior conviction for murder.  In his fifth claim for relief, Norris contends that the introduction of his prior conviction denied him a fair trial in violation of his right to due process of law.

Norris moved outside the presence of the jury for a ruling barring evidence of his conviction.  He acknowledged that the fact that he had a prior felony conviction was admissible for impeachment, but argued that the specific nature of the conviction was unduly prejudicial. *See* 22 Tr. at 423-29, 500-06.  The prosecutor argued that the nature of the conviction was relevant to Norris' argument that he did not intend to kill the baby.  The trial court denied Norris' motion.  Norris testified that he had a prior felony conviction for which he received an eight year sentence.  On cross examination, and over a defense objection, the prosecutor elicited the fact that the prior conviction was for murder.

Respondent notes that Norris raised a claim concerning this evidence on direct appeal,

but only argued that it violated state law.  Norris cited one federal case in his brief, but only for a general proposition about the proper purposes of impeachment.  Nothing in Norris' argument raises an issue under the United States Constitution.  *See* Brief for Appellant at 23-27.  The TCCA held that the trial court did not abuse its discretion in admitting the evidence and that any error was harmless.  *Norris*, 902 S.W.2d at 441.

The AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(I) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  "[A]bsent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."  *Orman v. Cain*, 228 F.3d 616, 619-20 (5th Cir. 2000); *see* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . .").  In addition, the Supreme Court has found that not only must a petitioner present the state court with his claim, but he must also alert the state court of the constitutional nature of the claims. *See Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.").  Because Petitioner did not present this claim as a federal constitutional claim to the Texas state courts, he has failed to properly exhaust the claim.

15

Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims. *Rose v. Lundy*, 455 U.S. 509 (1982). Such a result in this case, however, would be futile because Petitioner's unexhausted claims would be procedurally barred as an abuse of the writ under Texas law. On habeas review, a federal court may not consider a state inmate's claim if the state court based its rejection of that claim on an independent and adequate state ground. *Martin v. Maxey*, 98 F.3d 844, 847 (5th Cir. 1996). A procedural bar for federal habeas review also occurs if the court to which a petitioner must present his claims to satisfy the exhaustion requirement would now find the unexhausted claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Texas prohibits successive writs challenging the same conviction except in narrow circumstances. TEX.CODE CRIM.PROC.ANN. art. 11.071 § 5(a) (Vernon Supp. 2002). The Texas Court of Criminal Appeals will not consider the merits or grant relief on a subsequent habeas application unless the application contains sufficient specific facts establishing the following:

> (1) the current claims have not been and could not have been presented previously in an original application or in a previously considered application because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; or
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

*Id.* The Texas Court of Criminal Appeals applies its abuse of the writ doctrine regularly and strictly. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (per curiam).

Petitioner does not claim that he could not have presented the claim in his direct appeal or his state habeas petition because the factual basis for the claim did not exist, or that he is actually

innocent.  Therefore, Petitioner's unexhausted claim does not fit within the exceptions to the successive writ statute and would be procedurally defaulted in the Texas courts.  *Coleman*, 501 U.S. at 735 n.1.  That bar precludes this Court from reviewing Petitioner's claim absent a showing of cause for the default and actual prejudice attributable to the default, or that this Court's refusal to review the claim will result in a fundamental miscarriage of justice.  *Id.* at 750.

### 1.     Cause

Norris argues that his state habeas counsel was ineffective for failing to raise this claim. He cites the Supreme Court's decisions in *Trevino v. Thaler*, 133 S.Ct. 1911 (2013), and *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), for the proposition that ineffective assistance of state habeas counsel can constitute cause for a procedural default.  *Martinez*, by its own terms, however, only provides that ineffective assistance of state habeas counsel can, under certain circumstances, constitute cause for a procedural default of an ineffective assistance of trial counsel claim.  *See Martinez*, 132 S.Ct. at 1315.  *Trevino* holds only that *Martinez* is applicable to the Texas post-conviction scheme.  Because this claim does not allege ineffective assistance of trial counsel, it does not fall within the scope of *Martinez*.  Norris therefore fails to demonstrate cause for his procedural default.

### 2.     Fundamental Miscarriage of Justice

A "miscarriage of justice" means actual innocence, either of the crime for which Norris was convicted or of the death penalty.  *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992). "Actual innocence of the death penalty" means that, but for a constitutional error, he would not have been legally eligible for a sentence of death.  *Id.*

To show actual innocence,

> [T]he prisoner must 'show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial, the trier of the facts would have entertained a reasonable doubt of his guilt.

*Kuhlmann v. Wilson*, 477 U.S. 436, 455 n.17 (1986).  More succinctly, the petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" in light of the evidence now presented.  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

The evidence of Norris' guilt was overwhelming.  He has not established that he is actually innocent of either capital murder or the death penalty.  Therefore, this claim is procedurally defaulted.

### C.   Parole

On cross examination, the prosecutor elicited from Norris that he only spent two years, nine months, and five days in prison on his eight year sentence for the prior murder.  In his closing argument, the prosecutor argued that Norris could not be rehabilitated, referring to the time Norris served and the fact that he murdered Georgia and her baby while on parole.  In his sixth claim for relief, Norris contends that, by raising the issue of parole, the prosecutor denied him a fair trial in violation of his right to due process of law.  Respondent argues that Norris' direct appeal raised only a state law claim concerning the prosecutor's questioning and argument, and that the claim is therefore procedurally defaulted.  Norris counters that he raised this due process claim in his state habeas corpus application.

Under Fifth Circuit law, this court must apply a two-step analysis in reviewing claims of

18

prosecutorial misconduct. *See United States v. Wise*, 221 F.3d 140, 152 (5th Cir. 2000), *cert. denied*, 532 U.S. 959 (2001); *United States v. Lankford*, 196 F.3d 563, 574 (5th Cir. 1999), *cert. denied*, 529 U.S. 1119 (2000). First, the Court must determine whether the prosecutor made an improper remark. *Wise*, 221 F.3d at 152. "If an improper remark was made, the second step is to evaluate whether the remark affected the substantial rights of the defendant." *Id.*

A "prosecutor's improper [conduct] will, in itself, exceed constitutional limitations in only the most egregious cases." *Menzies v. Procunier*, 743 F.2d 281, 288-89 (5th Cir. 1984).

> [I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned, rather "the relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' In order to constitute a denial of due process "'the acts complained of must be of such quality as *necessarily prevent a fair trial*.'" Moreover, the burden is on the habeas petitioner to also show a reasonable probability "that but for these remarks 'the result would have been different.'"

*Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir. 1995) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Derden v. McNeel*, 978 F.2d 1453, 1457 (5th Cir. 1992), *cert. denied*, 508 U.S. 960 (1993); and *Felde v. Blackburn*, 795 F.2d 400, 403 (5th Cir. 1986)), *cert. denied sub nom. Nichols v. Johnson*, 518 U.S. 1022 (1996)(emphasis in *Nichols*).

Norris makes no showing that the prosecutor's question and argument rendered his trial fundamentally unfair. Assuming that the fact that he was on parole was irrelevant to the question of his guilt, the evidence of guilt was overwhelming. That evidence included his own statement and testimony, and testimony by his mother and members of Georgia's family. Under these circumstances, Norris cannot show a reasonable probability that but for these remarks the result would have been different. He is not entitled to relief on this claim.

### D.   Prosecutorial Comments About Defense Counsel

At the conclusion of jury selection, the trial court appointed attorney Walter Boyd to assist lead counsel Joe Cannon in defending Norris.  On the first day of testimony, a police officer testified as a witness for the State.  At the conclusion of direct examination, Boyd requested a moment to read the officer's report, stating:  "This was just furnished to us today, Your Honor . . . ."  21 Tr. at 136-37.  The prosecutor objected to Boyd's statement, saying, among other things, "[t]hat's false," "it's a lie," and "[i]t is unethical."  *Id.* at 137.  Boyd objected to the prosecutor's remarks, explaining that he received the report that day, though Cannon saw it before that.  The judge instructed the jury to disregard the prosecutor's remarks, and denied a defense motion for a mistrial.  *Id.* at 137-39.  After cross examination, the prosecutor again raised the subject, demanding his files back because "[w]e've shown it to them.  They've denied seeing it, and I want them back."  *Id.* at 142-43.

During the penalty phase, defense counsel told the judge that a defense witness was late arriving to testify.  He told the court that the witness was a schoolteacher.  25 Tr. at 48.  The prosecutor then objected that counsel's statement to the court was hearsay.  *Id.* at 48-49. Defense counsel responded that he had been prepared to proceed but, because the prosecutor objected, he would seek a continuance.  He added that if the prosecutor would permit him to address the court, then he would not seek the continuance.  *Id.* at 48.  The prosecutor responded:  "Your Honor, we're not up to extortion today.  We will properly object to anything this lawyer wants to announce that would [be] hearsay . . . .:  *Id.* at 48-49.  Defense counsel objected to the word "extortion," and the court instructed the jury to disregard the comment.  The court denied Norris' motion for a mistrial.  *Id.* at 49.  In his seventh claim for relief, Norris argues that the prosecutor's comments denied him a fair trial.  In his eighth claim for relief, he contends that his

20

Eighth and Fourteenth Amendment rights were violated when the trial court denied his motion for a mistrial.

"To constitute a due process violation, the prosecutorial misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)).  "'A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'" *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (quoting *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992)), *cert. dismissed*, 531 U.S. 1134 (2001).

Norris raised this claim in his direct appeal, but presented it only as a matter of Texas state law.  *See* Appellant's Brief at 33-37.  Because Norris failed to alert the TCCA to the federal constitutional nature of this claim, they are unexhausted and procedurally defaulted.  Norris makes no showing of cause for this default.  Therefore, this Court cannot address the claim. *Coleman*, 501 U.S. at 735 n.1.

### E.      Prosecutorial Comment On Appeals

During direct examination of an assistant medical examiner, the prosecutor asked to withdraw his previous offer of certain photographs, and replace them with other photographs. He stated:

> Your Honor, for the record, the State will offer to withdraw State's Exhibits 16, 17, and 18 from its offer into evidence in lieu of the court's accepting into evidence State's exhibits 36, 37, and 38, so that the Court of Appeals may see that we have inflammatory photographs and we have elected not to use those but elected instead to use the ones that are least offensive out of the group.
>
> We will withdraw those and ask the court to seal them away from the jury to include them in the appellate record so that the Court of Appeals, I hope, may see

that the State of Texas is not trying to inflame the jury but is in fact, doing its duty
and proving what it's required to prove . . . .

Norris objected to the references to the Court of Appeals, and the court instructed the jury to
disregard them, but denied a motion for a mistrial.

In *Caldwell v. Mississippi*, 472 U.S. 320 (1985), the Supreme Court held that a
prosecutor may not diminish the jurors' sense of responsibility for a death sentence by telling
them that an appellate court bore the ultimate responsibility for determining the appropriateness
of the sentence.   In addressing this claim on direct appeal, the TCCA stated "[t]hat did not
happen here."  *Norris*, 902 S.W. 2d at 443.

In *Caldwell*, the prosecutor, among other things, told the jurors:   "Now, [the defense]
would have you believe that you're going to kill this man and they know . . . that your decision is
not the final decision.  My God, how unfair can you be?  Your job is reviewable."  472 U.S. at
325.

The prosecutor's comments in this case are not comparable to those held unconstitutional
in *Caldwell*.  There, the prosecutor expressly told the jurors that they were not responsible for
their decision.  In this case, the prosecutor made no such comment or suggestion.  Norris points
to no case holding that a prosecutor in a capital case may not mention appeals in any way, and
this Court is aware of no such holding.  The TCCA's application of *Caldwell* to these facts was
reasonable.  Therefore, under the AEDPA, that conclusion is entitled to deference, and Norris is
not entitled to relief on his ninth claim for relief.

### F.   <u>Prosecutorial Comment on Parole</u>

In summation at the end of the penalty phase, the prosecutor argued that Norris could not
be rehabilitated, noting that he served only a fraction of his prior sentence for murder, and

murdered two more people while on parole.  25 TR. at 87-88.  In his tenth claim for relief, Norris argues that this improperly called attention to the application of parole law in violation of the Eighth and Fourteenth Amendments.

On direct appeal, Norris presented this claim, arguing that it was "fundamental error" under state law.  He never presented it as a federal constitutional claim.  As discussed above, that renders this claim unexhausted and procedurally defaulted.  Because Norris does not demonstrate cause for the default, this Court cannot consider the claim.  Moreover, the TCCA found that the claim was waived, and thus defaulted, because Norris did not raise a contemporaneous objection. *Norris*, 902 S.W.2d at 443-44.

Default notwithstanding, the TCCA found that the argument was a plea for law enforcement and was proper under Texas law.  Norris identifies nothing about the statement that was false, or that rendered the trial fundamentally unfair.

### G.    Prosecutorial Comment on Jury Responsibility

In summation during the punishment phase, the prosecutor said to the jury:

[I]f you don't do something about this and he kills again, aren't you just a little bit responsible? . . . If you don't stop him and he does it again, you had your chance to stop him.  What are you going to do then?  You will have had some responsibility,  possibly, I'm not going to say blood on your hands.  But it will be more difficult to wash them.

25 Tr. at 90.   In his eleventh claim for relief, Norris contends that this argument violated his Eighth and Fourteenth Amendment rights to a fair sentencing determination.

As with his parole argument, Norris raised this claim only as an issue of state law in his direct appeal.  Therefore, for the reasons discussed above, this claim is procedurally defaulted.  Again, the TCCA found that the claim was waived, and thus defaulted, because Norris did not

23

raise a contemporaneous objection.  *Norris*, 902 S.W.2d at 445.

### H.    Prosecutorial Comment on Effect of Life Sentence on Future Capital Juries

In urging the jury to return a death sentence, the prosecutor said:

> What are you going to say to the other killers who come before you and say, "Look, folks, I went to kill one person in the robbery and I'm wrong.  I wasn't on parole for murder.  How are you going to give me a death sentence?  You let that guy off with all he did.["]  People get death sentences for less than this.  Is that fair?

25 Tr. at 97-98.  Norris argues that this is "fundamental constitutional error," violating due process.

On direct appeal, Norris presented this claim only as a matter of state law.  *See* Appellant's Brief at 47-48.  Therefore, his federal constitutional claim is unexhausted and procedurally defaulted.  Moreover, the TCCA found that the claim was waived because Norris raised no contemporaneous objection.  *Norris*, 902 S.W.2d at 445.  Therefore, this claim is procedurally defaulted.

### I.    Cumulative Error

In his fourteenth claim for relief, Norris argues that the instances of alleged prosecutorial misconduct discussed above had the cumulative effect of denying him due process.  Again, Norris raised this claim on direct appeal solely as a state law claim.  *See* Appellant's Brief at 49-54.  Therefore, any federal claim based on cumulative error is unexhausted and procedurally defaulted.

Procedural default notwithstanding, this claim is without merit.  As noted above, Norris' individual claims of prosecutorial misconduct are without merit, procedurally defaulted, or both.  "Meritless claims or claims that are not prejudicial (or claims that are procedurally barred)

cannot be cumulated." *Hughes v. Dretke*, 412 F.3d 582, 597 (5th Cir. 2005).

**J.**     ***Penry***

Norris presented mitigating evidence.  This included evidence that: the murders were a crime of passion; Norris was emotionally distraught at the time of the offense; Georgia embarrassed him when he tried to approach her at church and hung up when he tried to call her; Norris had the opportunity to shoot other members of Georgia's family, but did not do so; Norris expressed remorse to his mother and his pastor; he turned himself in to the police immediately after the crime; he accepted responsibility for the crime; he had been a good student; he was active in his church; he was a good father to his own daughter and treated Georgia's son like his own; and he maintained regular employment.

At Norris' trial in 1987, the trial court submitted only two special issues to the jury: whether he acted deliberately and whether there was a probability that he posed a future danger. They were not given a general mitigation instruction.[3]   Norris now argues that neither of these issues gave the jury an avenue to give effect to his mitigating evidence.

In *Lockett v. Ohio*, 438 U.S. 586, 608 (1978), a plurality of the Supreme Court held "that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . as a basis

---

[3]     Under current Texas law, the general mitigation instruction asks jurors

> [w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

TEX. CODE CRIM. PROC. art. 37.0711, § 3(e).

25

for a sentence less than death."  438 U.S. at 604 (emphasis in original).  This holding is based on

the plurality's conclusion that death "is so profoundly different from all other penalties" as to

render "an individualized decision . . . essential in capital cases."  *Id.* at 605.  Two years after

Norris' trial, the Supreme Court issued its decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989)

("*Penry I*").  In *Penry I*, the Court held that the absence of a mitigation instruction prevented

Penry's jury from giving effect to his mitigating evidence of his mental retardation and

childhood abuse.  The Court noted, for example, that "Penry's mental retardation was relevant to

the question whether he was capable of acting "deliberately," but it also 'had relevance to [his]

moral culpability beyond the scope of the special verdict questio[n].'"     *Penry I*,

http://web2.westlaw.com/find/default.wl?mt=27&db=708&tc=-

1&rp=%2ffind%2fdefault.wl&findtype=Y&ordoc=1989094482&serialnum=1988080757&vr=2.

0&fn=_top&sv=Split&tf=-

1&referencepositiontype=S&pbc=0A9516FF&referenceposition=2333&rs=WLW14.07 (quoting

*Franklin v. Lynaugh*,  492 U.S. at 322 (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 185 (1988)).

In several subsequent cases clarifying and applying *Penry I*, *see, e.g.*, *Penry v. Johnson*, 532 U.S.

782 (2001)*("Penry II"*); *Tennard v. Dretke*, 542 U.S. 274 (2004), the Supreme Court held that a

capital sentencing jury must "be able to consider and *give effect to* a defendant's mitigating

evidence in imposing sentence."  *Penry II*, 532 U.S. at 797 (internal quotation marks, citation

and brackets omitted).

Respondent points out that the TCCA issued its decision on Norris' direct appeal in 1995,

approximately six years after *Penry I* was decided.  Therefore, respondent argues, the TCCA

"incorporated that case into its analysis."  Indeed, the TCCA cites *Penry I* in its decision.  *See*

*Norris*, 902 S.W.2d at 447.  The TCCA held that, unlike in *Penry I*, the jury was able to consider Norris' mitigating evidence by applying it to the questions of deliberateness and future dangerousness.  The TCCA's resolution of this claim was an unreasonable application of *Penry I.*

> In *Penry I,* the Court observed that
>
> Underlying *Lockett* and *Eddings* [*v. Oklahoma*, 455 U.S. 104 (1982)] is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant . . . Moreover, *Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence.

*Penry I*, 492 U.S. at 319.

The TCCA discussed *Penry I*, but concluded that the two special issues allowed the jury to give consideration and effect to Norris' mitigating evidence.  This may be true with regard to some of Norris' evidence, but the jury had no avenue to give effect to other such evidence.

Evidence that Norris acted in a state of emotional distress, for example, might engender some sympathy from a juror empowered to give evidence any mitigating effect the juror deems appropriate, but could also strengthen the State's case for future dangerousness by showing that Norris reacts to intense emotions by becoming violent.  In this sense, this evidence is much like the evidence of mental retardation at issue in *Penry I*; the jurors had no avenue to give that evidence mitigating value, but could have found it aggravating, *i.e.*, that it made him more likely to pose a future danger.  *See Penry I ,* 492 U.S. at 320-26.  Similarly, Norris' evidence of involvement in his church, long term gainful employment, and his relationships with others could be seen by a juror as evidence of a generally good character, but are not relevant to the

issues of deliberateness or future dangerousness.

In response to Norris' *Penry* argument, Respondent cites pre-*Penry I* cases.  *See Jurek v. Texas*, 428 U.S. 262 (1976); *Franklin v. Lynaugh*, 487 U.S. 164 (1988).  To the extent that these cases are inconsistent with *Penry*, they are not controlling.

Respondent also cites several post-*Penry I* cases, but these are distinguishable.   In *Johnson v. Texas*, 509 U.S. 350 (1993), the Court found that evidence of the defendant's youth could be considered in the context of the future dangerousness instruction.  *Callins v. Collins*, 998 F.2d 269, 275 (5th Cir. 1993), and *Wilkerson v. Collins*, 950 F.2s 1054, 1062 (5th Cir. 1992) addressed evidence of remorse and acceptance of responsibility, finding that such evidence could be considered in the context of the deliberateness and future dangerousness issues.   Norris' evidence regarding his emotional state and evidence of good character are different, and could not be considered and given weight in answering the two special issues given to Norris' jury.

Because at least some of Norris' mitigating evidence– specifically, evidence of his emotional state and general good character evidence-- does not fall within the scope of the two special issues given to the jury, the jury did not have an avenue to consider and give effect to that evidence.  Therefore, Norris is entitled to relief on this claim.

### K.    Ineffective Assistance Of Counsel

In his final claim for relief, Norris argues that his trial counsel rendered ineffective assistance at both the guilt-innocence, and punishment phases of his trial. This claim includes several subclaims.

### 1.    Standard of Review

To prevail on a claim for ineffective assistance of counsel, Petitioner

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In order to prevail on the first prong of the *Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.  *Id.* at 687-88.  Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances.  *Id.* at 688. Review of counsel's performance is deferential.  *Id.* at 689.

In extremely rare circumstances, prejudice may be presumed from the delinquent performance of counsel.  This presumption of prejudice may occur if there is a complete denial of counsel, or if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.  *United States v. Cronic*, 466 U.S. 648, 659 (1984).

Norris argues that his lead counsel, Joe Cannon, was more concerned with not offending the trial court, so as not to jeopardize future court appointments, than with defending his client. He also suggests that Cannon was impaired by medication, and notes that Cannon was the lawyer in another case in which he slept during parts of the trial.  Norris points to no evidence that Cannon slept during his trial.

In this case, Norris'

> argument is not that his counsel failed to oppose the prosecution throughout the . . . proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind.

*Bell v. Cone*, 535 U.S.685, 696-97 (2002).  To generate the *Cronic* presumption of prejudice, "an attorney must completely fail to challenge the prosecution's case, not just individual elements of

29

it." *Haynes v. Cain*, 298 F.3d 380-81 (5th Cir.) (*en banc*), *cert. denied*, 537 U.S. 1072 (2002) (citation omitted).   Because Norris' counsel presented evidence, cross-examined adverse witnesses, raised objections, and generally tested the State's case, Norris' ineffective assistance of counsel claims are reviewed under the *Strickland* standard.

>        2.        Guilt-Innocence Phase

> .        a.        Failure to Object to Admission of Norris' Pretrial Statement

Norris first argues that counsel were ineffective for failing to object to the admission of his pretrial statement, thereby failing to preserve error.   During trial, Norris challenged the voluntariness of his pretrial statement. The trial court conducted a *Jackson-Denno* hearing outside the presence of the jury.   Under examination by defense counsel, Police Officer James Waltmon testified that he informed Norris that his statement could be used "for or against him" in court.   22 Tr. at 304.   Under questioning by the prosecutor, Waltmon testified that he read Norris the warning printed on a form, which said:   "Any statement you make may be used as evidence against you at your trial."   *Id.* at 305.   The trial court found that the statement was voluntary and admissible, and a redacted version was admitted into evidence.   The prosecutor stated that the redactions removed parts of the statement that were untrue.   Defense counsel did not object to the admission of the statement, but did object to the redactions.   *Id.* at 363.   The State introduced the redacted version, and the defense then introduced the redactions, in which Norris accused Georgia's older sons of attacking him. *Id.* at 374-75.   Norris raised this issue on appeal, and the TCCA declined to review the claim because counsel failed to object at trial. *Norris*, 902 S.W.2d at 439.

Norris raised an ineffective assistance of counsel claim in his state habeas corpus

30

application, contending that counsel was ineffective by failing to object to the admission of his statement at trial.  1 SH at 32-35.[4]   On April 17, 2008, the trial court conducted a hearing on Norris' claim.  Norris' trial co-counsel, Walter Boyd, Jr., testified that counsel attempted to preserve error regarding the voluntariness of the statement but, because Norris wanted to testify, the information in the statement would nonetheless have come out at trial.  SHRR at 22-23.[5]

The state habeas court made findings.  These included that Norris claimed, during the *Jackson-Denno* hearing, that the officer who took his statement told him the statement would help him if it was true, but hurt him if it was false.  Norris acknowledged that he wanted to give his statement and was not threatened or promised anything.  He acknowledged that he gave the statement voluntarily.  SH at 403-04.  Boyd testified that counsel took steps to preserve error, but that it was a moot point because Norris wanted to testify.  He further testified that counsel's strategy was to show that Norris did not intend to kill the baby, and to argue that Norris should be convicted of a lesser-included offense.  *Id.* at 404-05.  The court further noted that eyewitnesses testified that Norris committed the offense, and that Norris' mother testified that Norris admitted shooting Georgia and the baby.  Norris testified that he committed the offense, though he said that he did not intend to kill the baby.  *Id.* at 405.  The habeas court found that counsel used a reasonable strategy and were not ineffective.  *Id.* at 406, 414-15.  The TCCA did not expressly refer to the findings or the claim, but denied relief on Norris' state habeas corpus application.  *Ex Parte Norris*, 390 S.W.3d at 341.

Whether or not counsel rendered deficient performance, Norris cannot demonstrate any

---

[4]     "SH" refers to the transcript of Norris' state habeas corpus proceedings.

[5]     "SHRR" refers to the reporter's record of the state habeas corpus hearing.

*Strickland* prejudice.  As noted above, in addition to Norris's statement, eyewitnesses testified that Norris committed the crime, Norris' mother testified that Norris admitted shooting Georgia and the baby, and Norris testified that he shot the victims, though he denied intending to kill the baby.  The evidence that Norris shot the victims was overwhelming.  Thus, even if counsel properly preserved the claim that the statement was inadmissible and even if the TCCA agreed, Norris fails to demonstrate that the TCCA would have found the error to be anything but harmless. Norris therefore fails to demonstrate any likelihood that the outcome would have been different had counsel preserved error, and thus fails to demonstrate *Strickland* prejudice.

b.    Questioning About Norris' Prior Sentence

Norris next complains that counsel rendered ineffective assistance by eliciting from him the fact that he had a prior felony conviction and received an eight year sentence.  He further contends that counsel was ineffective for failing to object when the prosecutor got Norris to acknowledge that he served only two years, nine months and five days of his eight year sentence.

Outside the presence of the jury, counsel advised Norris against testifying, informing him that, if he testified, the State would introduce evidence of his prior conviction. 22 Tr. at 282-84. Counsel also asked the trial court to exclude the prior conviction as more prejudicial than probative.  *Id.* at 423-25.  The court denied the motion, and denied counsel's request for a running objection.  *Id.* at 502-07.

The state habeas court found that Norris wanted to testify.  Defense counsel elicited testimony about Norris' prior conviction and sentence.  Counsel testified at the writ hearing that he wanted to bring this information out before the prosecution did "to put it behind us."  SH at 407 (citing SHRR at 38).  Counsel objected to the State's questioning Norris about the prior

32

conviction.  Counsel further explained at the writ hearing that the jury was aware of the date of the prior offense, and of the capital murder.  They could therefore figure out that Norris served less than three years on the prior conviction.  *Id.* at 408.  The trial court instructed the jury to use the information for impeachment purposes only.  *Id.* at 409.  The court found that counsel employed a reasonable strategy to elicit the evidence before the State did, and were not ineffective.  *Id.* at 415-16.

Norris does not dispute that a testifying defendant is subject to impeachment by information about prior felony convictions if the court determines that the probative value of the evidence outweighs its prejudicial effect.  Tex.R.Evid. 609(a); *Harper v. State*, 930 S.W.2d 625, 630-31 (Tex. App.--Houston [1st Dits.] 1996).  The trial court denied counsel's motion to exclude Norris' prior conviction.  Therefore, the State was going to impeach Norris with evidence of his prior conviction.  Defense counsel eliciting unfavorable testimony "to draw the sting and appear honest to the jury" is not deficient performance.  *Charles v. Thaler*, 629 F.3d 494, 502 (5th Cir. 2011) (citation and internal quotation marks omitted).  Therefore, counsel were not deficient for eliciting this testimony.

c.    Failure to Seek a Limiting Instruction

Shortly after Norris' arrest, his mother, Mary Ellen Norris, gave a statement to the police. In the statement, Mary Ellen said that Norris acknowledged shooting Georgia and the baby.[6] She also stated that she gave police permission to search her house, and told them where to find the murder weapon.  During her trial testimony, Mary Ellen contended that there were some

---

[6]    Respondent's brief cites to volume 23 of the trial transcript with regard to Mary Ellen's statement, but that volume is missing from the state court records filed by respondent. Nonetheless, Norris does not dispute the fact that his mother gave a statement or the substance of her statement.

inaccuracies in her statement. She stated that Norris told her that he shot the baby by accident, but that the police did not write down that part of her statement. 24 Tr. at 667-68. Norris alleges that counsel were deficient for failing to object to the admission of Mary Ellen's pretrial statement, or requesting an instruction limiting its use to impeachment. He notes that the State argued in summation that Mary Ellen's statement did not say that Norris told her he shot the baby accidentally.

During state habeas proceedings, Norris' counsel testified that they called Mary Ellen as a witness to garner sympathy for Norris, show that Norris was remorseful, and present evidence that the shooting of the baby was accidental. Counsel did not think Mary Ellen's testimony hurt Norris. SHRR at 74-78.

The state habeas court found that Mary Ellen's statement was largely duplicative of other information presented to the jury and that counsel were not ineffective for failing to object. SH at 411. The court also concluded that the statement was properly admitted for impeachment, and that counsel were therefore not deficient for failing to object.

Norris does not dispute that Mary Ellen's statement was admissible for impeachment purposes. Therefore, any objection to its admission would have been overruled. "This Court has made clear that counsel is not required to make futile motions or objections." *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990).

Norris' argument regarding the prosecutor's comments during summation are puzzling. He contends that counsel should have sought to limit the statement to impeachment, but complains that the prosecutor used it to impeach Mary Ellen's trial testimony. In any event, as discussed above, there was substantial evidence supporting the intent element of the capital

34

murder charge despite any discrepancies between Mary Ellen's statement and her trial testimony. Therefore, Norris fails to identify either deficient performance or *Strickland* prejudice.

        3.    <u>Punishment Phase</u>

In summation during the punishment phase of Norris' trial, the prosecutor argued that Norris tried to use the baby to control Georgia, *see* 25 Tr. at 81-82, and referred to the fact that Norris was on parole when he killed Georgia and the baby, *id.* at 94-98.  Under Texas law, a prosecutor may present argument to the jury on four types of issues:  (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) responses to opposing counsel's argument; and (4) pleas for law enforcement.  *Moody v. State*, 827 S.W.2d 875, 894 (Tex.Crim.App.), *cert. denied sub nom. Moody v Texas*, 506 U.S. 839 (1992).  The prosecutor's comments clearly fall under the categories of summation of the evidence and pleas for law enforcement.  Because the argument was proper under Texas law, any objection would have been futile.

Moreover, Norris fails to identify any prejudice.  The evidence was overwhelming and the crime was horrific.  Norris murdered his ex-girlfriend and her two year old child, and had a prior conviction for murder.  Even if these comments by the prosecutor were improper, Norris fails to demonstrate any probability that an objection would have changed the outcome of the punishment phase of his trial.

## IV.  Certificate of Appealability

Norris has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings.  *See Alexander v. Johnson*,  211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a *COA sua sponte*.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.").  A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request.  *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further."  *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000).  The Supreme Court has stated that

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds.  We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it

debatable whether the district court was correct in its procedural ruling.
*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)."  *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This Court has carefully considered each of Norris' claims and concludes that each of the claims, with the exception of his *Penry* claim, is foreclosed by clear, binding precedent.  The court concludes that under such precedents Norris has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), on any claim except his *Penry* claim. The court therefore concludes that Norris is not entitled to a certificate of appealability on his claims.

## V.  Conclusion and Order

For the foregoing reasons, it is **ORDERED** as follows:

1.      Respondent William Stephens' Motion for Summary Judgment(Document No. 11) is **GRANTED IN PART** and all of Norris' claims except his *Penry* claim are dismissed;

2.      Petitioner Michael Wayne Norris' Petition for a Writ of Habeas Corpus (Document No. 7) is **GRANTED IN PART** only as to his *Penry* claim*;*

3.      A writ of habeas corpus shall issue directing Respondent to release Norris from custody unless, within 120 days of the entry of final judgment in this case, the State of Texas either: a) grants Norris a new sentencing hearing; or b) vacates Norris' death sentence and resentences him in accordance with

applicable Texas law

4.      No Certificate of Appealability shall issue in this case;

5.      This Order is stayed until all post-judgment motions and appeals are final or the time to file such motions and appeals expires; and

6.      Final judgment will be entered by separate order.

SIGNED at Houston, Texas, this 28th day of March, 2015.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE